IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JANE DOE,** <br>                **Plaintiff,** <br><br> v. <br><br> **CITY OF PHILADELPHIA,** <br> **INDEPENDENCE BLUE CROSS,** <br> **PHILADELPHIA FIREFIGHTERS' &** <br> **PARAMDEICS UNION, I.A.F.F., LOCAL** <br> **22** <br>                **Defendants.** | **CIVIL ACTION** <br><br><br><br> **NO.  24-0468** |

## **OPINION**

Defendant Independence Blue Cross ("IBX") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiff Jane Doe's Second Amended Complaint, in which she alleges that IBX, along with her employer and union, discriminated against her on the basis of sex and disability in denying insurance coverage for certain gender-affirming care procedures in violation of: (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (2) the Philadelphia Fair Practices Ordinance ("PFPO"), Phila. Code § 9-1101 *et seq.*; and, (3) Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116 (premised on violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794).  For the reasons stated below, IBX's Motion will be granted in part and denied in part.

**I.      BACKGROUND**

According to her operative Complaint, well-pleaded allegations from which are taken as true, *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009), Doe is a longtime firefighter who has been employed by the City of Philadelphia for almost three decades.  She is a member of her union, Defendant Philadelphia Firefighters' & Paramedics' Union, I.A.F.F., Local

22 ("Local 22").  She receives health insurance through a self-funded employer-sponsored health plan, underwritten and administered by IBX.

Doe is a transgender woman.  She has been diagnosed with gender dysphoria, a medical condition recognized in the Diagnostic and Statistical Manual of Mental Disorders 5.  The World Professional Association for Transgender Health ("WPATH"), which publishes "widely accepted standards of care for the treatment of gender dysphoria," notes that "medically necessary treatment for gender dysphoria may require facial feminization surgery" ("FFS").  "[I]n an attempt to alleviate [her] gender dysphoria," Doe sought—but IBX denied her request—preauthorization for insurance coverage from IBX for a series of FFS procedures, including "a rhinoplasty, septoplasty, septorhinoplasty, dermabrasion for rhinophyma, forehead reduction, [and] repair of brow ptosis (supraciliary, mid-forehead or coronal approach)."  On top of these, Doe "will need hair transplant procedures."

IBX attached a copy of its Medical Policy Bulletin and Personal Choice Health Benefits Program to its Motion to Dismiss, which can be considered alongside Doe's Second Amended Complaint because it is "explicitly relied upon" by that pleading.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  That document, whose authenticity Doe does not dispute, serves as a basis for "mak[ing] decisions on coverage."  It divides gender-affirming care into multiple categories, including: (1) medically necessary (*e.g.*, bilateral mastectomy); (2) medically necessary, gender-specific (*e.g.*, mammograms); (3) not medically necessary; and, (4) potentially cosmetic.  Procedures in this last category, which includes FFS, "may be performed in combination with other surgeries for the treatment of gender dysphoria and are considered cosmetic or potentially cosmetic services, unless medical necessity demonstrating a functional impairment can be identified."  IBX denied Doe's request, concluding that she did not

2

have a "functional impairment" that would allow for reimbursement for the procedures.

Doe alleges that IBX misapplied the "functional impairment" exception to the exclusion, "requiring [her] to state a physical deformity, disfigurement, abnormality, or impairment, when [she] had demonstrated functional impairments in social and occupational functioning." IBX also denied Doe's appeals of that decision. As a result of these denials, Doe "was forced to expend time and effort, and unnecessary expense, appealing the decision and gathering documentation in support of her claim" and suffered severe distress, including suicidal ideation.

Doe seeks damages and an injunction that, among other things, would order IBX to: (1) "perform a reevaluation of [her] claim, providing that [she] is covered for all FFS and related procedures wrongfully denied, and providing that [she] will be covered for FFS surgeries, procedures, and medical benefits, and that all benefits will be paid moving forward;" (2) hold LGBT sensitivity training; and, (3) "adopt and enforce a written policy that the preferred name that is consistent with the claimant's gender identity will be used to refer to the claimant throughout the claims process."

## II.     LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* When analyzing a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210.

Where, as here, an amended pleading already has been filed, further amendment may be allowed "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). That means that "leave to amend generally must be granted unless the amendment would not cure the deficiency." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000); *accord Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).

### III. DISCUSSION

#### A. Doe's Employment-Based Discrimination Claims

IBX argues that Plaintiff's claims for sex and gender identity discrimination under Title VII and the PFPO fail because it is not and never has been her employer or an agent of her employer, the City of Philadelphia. Title VII applies only to "an employer['s]" discriminatory practices "because of [an] individual's . . . sex." 42 U.S.C. § 2000e-2(a).[1] IBX, a third-party claims administrator, argues that it does not count as Doe's "employer"—"a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person," *id.* § 2000e(b)—and therefore cannot be sued by Doe under that statute.

"In order to state a Title VII claim," a plaintiff "must allege an employment relationship with the defendant[]." *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 119 (3d Cir. 2013). The statute's plain text reaches employers' agents too. *Doe v. Pennsylvania*, 582 F. Supp.3d 206, 213 (M.D. Pa. 2022) (citing *City of L.A., Dep't of Water and Power v. Manhart*, 435 U.S. 702, 717 n.33 (1978)). Whether an employment relationship exists under Title VII

---

[1] Title VII and the PFPO are analyzed according to the same standards. *Tomaszewski v. City of Philadelphia*, 460 F. Supp.3d 577, 592 n.8 (E.D. Pa. 2020). Doe argues that PFPO "includes a broader definition of an 'employer'" than Title VII does, and its "plain language" covers IBX. She does not explain why this is the case, and her argument is unsupported by any citation to legal authority apart from a single citation to a PFPO provision, so it is waived. *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997); *see* E.D. Pa. Local Civ. R. 7.1(c).

depends on a multifactor analysis set out by the United States Supreme Court in *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318 (1992). *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 213 (3d Cir. 2015). *Darden* pointed courts to several non-exhaustive factors, including:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 214 (quoting *Darden*, 503 U.S. at 323-24).

Doe argues that IBX can be sued under Title VII because, as the insurance plan's third-party administrator, it "had control over the subject benefits—and the City and Union did not," and "an employer may not delegate the provision of employer-sponsored health benefits to a separate corporate entity, and thereby escape liability for a discriminatory benefit plan." She also points out that the City and the Union "have disclaimed any involvement in the denial of benefits alleged," which "would leave [IBX] . . . responsible for the provision of health insurance benefits."

In making this argument, Doe relies heavily on a case from the Middle District of Pennsylvania that also involved the denial of insurance coverage for gender-affirming care. *Doe*, 582 F. Supp.3d at 208. In that case, the plaintiff, an employee of Pennsylvania's Department of Human Services, sought and was denied coverage for a bilateral mastectomy, which the plaintiff's doctor had concluded was medically necessary. *Id.* at 209. He sued, among other defendants, the Pennsylvania Employees Benefit Trust Fund ("PEBTF"), which was "governed by a board of trustees comprised of at least 14 members . . . appointed by either a union or by the

5

Commonwealth's governor" and, according to the complaint, "act[ed] on behalf of the Commonwealth of Pennsylvania to provide, administer, and set policy for health insurance that it provides to state employees. *Id.* The district court rejected the plaintiff's argument that the PEBTF could be treated as his employer under *Darden* simply because it "establishes and set up the health insurance benefits for Pennsylvania state employees." *Id.* at 213. But the court noted that, as a creature of state law regulated by government appointees and funded by state entities, the PEBTF "derives authority from and is tasked by the Commonwealth to act on its behalf regarding state employee health benefits." *Id.* at 214. It held that a board with such "power delegated by the state" could be sued under Title VII. *Id.* (citations omitted).

      Doe argues that IBX is akin to the PEBTF in that it, like PEBTF, "underwrote and administered the subject plan." But PEBTF did far more than that. It received legal authority from—and was funded and partially governed by—the Commonwealth of Pennsylvania, the plaintiff's own employer. *Id.* That made it "'so closely intertwined with' [the Commonwealth] that it [could] be held liable" under Title VII. *Id.* (quoting *Spirt v. Teachers Ins. Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir. 1982), *judgment vacated sub nom. Long Island Univ. v. Spirt*, 463 U.S. 1223 (1983)). Doe's allegations here instead look like those that the same district court held could not give rise to Title VII liability against the plaintiff's insurance company, Highmark Health Insurance. In an earlier opinion, the district court dismissed his claims under Title VII against Highmark because merely alleging that a third party "'was involved in' and 'had control over' a benefit of his employment" was insufficient to plausibly allege an employment relationship under *Darden*. *Doe v. Pennsylvania*, 2021 WL 1212574, at *8 (E.D. Pa. Mar. 31, 2021). That is what IBX is alleged to have done here.

      Therefore, as alleged in her Second Amended Complaint, IBX cannot be considered

6

Doe's "employer" under Title VII. Her claims against IBX under that statute will be dismissed with prejudice in that amendment would be futile.[2]

### B. Doe's Claims Under the Affordable Care Act

Section 1557 of the ACA provides that "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance" as protected by, among other statutes, Title IX of the Education Amendments of 1972 and Section 504 of the Rehabilitation Act. 42 U.S.C. § 18116(a); *see Doe v. Indep. Blue Cross*, 2023 WL 8050471, at *3 (E.D. Pa. Nov. 21, 2023). IBX "[a]ssum[es] for purposes of this Motion" that it is covered by the ACA but argues that it did not discriminate against Doe under either statute.

#### *i. Sex-Based Discrimination Under Title IX*

Title IX prohibits intentional discrimination "on the basis of sex" in programs receiving federal funding. 20 U.S.C. § 1681(a); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005); *see generally Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 316-17 (3d Cir. 2014) (McKee, C.J., concurring in part and dissenting in part).

Interpreting Title VII, the Supreme Court has held that discrimination based on someone's transgender identity is sex-based discrimination. *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020). As the Supreme Court explained in *Bostock*:

> [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

---

[2] The Court thus does not reach IBX's arguments that: (1) Doe did not suffer an adverse employment action as required to state a discrimination claim under Title VII, or, (2) Doe failed to exhaust her administrative remedies to pursue her PFPO claim in court.

7

*Id.*; *cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion). While the *Bostock* Court had no occasion to decide whether its logic applied to statutes other than Title VII, 590 U.S. at 681, and while Title IX traces its lineage to Title VI of the Civil Rights Act of 1964, not Title VII, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694-95 (1979)), IBX does not argue that *Bostock* is necessarily inapplicable to this case, it does, however, say it is inapposite because Doe has failed to plausibly allege intentional sex discrimination even under *Bostock*'s logic.[3] Specifically, IBX states that Doe "has failed to plead facts to state sex discrimination under" either Title VII or Title IX. It submits that, because Doe requested coverage for procedures that were not covered "for any person, regardless of gender or gender identity" absent a functional impairment, its conduct was not discriminatory.

      IBX's argument fails. True, its policy of not paying for "potentially cosmetic" services like FFS absent "medical necessity demonstrating a functional impairment" is facially neutral, unlike the exclusions implicated by some other cases, which expressly denied coverage for

---

[3] To be sure, there is good reason to apply *Bostock*'s logic to Title IX. Despite their divergent legislative histories, courts and agencies nonetheless "understandably often look to employment discrimination jurisprudence under Title VII" to evaluate Title IX's scope. *Tingley-Kelley v. Tr. of Univ. of Pa.*, 677 F. Supp.2d 764, 775 (E.D. Pa. 2010) (citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) (other citations omitted)); *accord Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534 & n.103 (3d Cir. 2018); *see, e.g.*, Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160, 37,168 (June 19, 2020); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74-75 (1992). More importantly, *Bostock*'s logic—that discrimination against a transgender person "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" or vice versa, 590 U.S. at 660, thus "treating that individual worse than others who are similarly situated," *id.* at 657 (citation omitted)—does not implicate the substantive differences between Title VII and Title IX, such as the latter's application to academic environments, *see Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808-09 (11th Cir. 2022) (en banc), allowance for single-sex sports teams, *see Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.3d 34, 63 (2d Cir. 2023) (en banc) (Menashi, J., concurring); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021), or passage under the Spending Clause rather than the Commerce Clause of Article I of the United States Constitution, *see Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1028 (7th Cir. 1997). Instead, *Bostock*'s conclusion flows from Title VII's and Title IX's common traits, such as their shared focus on eliminating sex-based discrimination, *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp.3d 725, 730 (S.D. Ind. 2022), and their shared but-for causation standard, *Wassell v. Pa. State Univ.*, 2024 WL 2057514, at *8 (M.D. Pa. May 7, 2024). *See Kadel v. Folwell*, 100 F.4th 122, 164 (4th Cir. 2024) (en banc).

procedures only when "associated with gender reassignment." *Boyden v. Conlin*, 341 F. Supp.3d 979, 988, 995 (W.D. Wis. 2018); *see also Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F. Supp.3d 104, 113 (D. Md. 2023) (applying the same logic to the provision of, rather than payment for, gender-affirming care); *Lange v. Houston County*, 608 F. Supp.3d 1340, 1346-47, 1360 (M.D. Ga. 2022), *aff'd*, 101 F.4th 793 (11th Cir. 2024) (applying Title VII to reach the same conclusion); *Fletcher v. Alaska*, 443 F. Supp.3d 1024, 1030 (D. Alaska 2020) (Title VII).[4] Nor does IBX deny coverage expressly because of a diagnosis of gender dysphoria. *See, e.g.*, *Fain v. Crouch*, 618 F. Supp.3d 313, 324-26 (S.D.W. Va. 2022), *aff'd sub nom. Kadel v. Folwell*, 100 F.4th 122, 164 (4th Cir. 2024) (en banc).

Rather, at least as currently alleged, IBX's application of its "functional impairment" requirement to Doe's request for "potentially cosmetic" procedures plausibly discriminated against her on the basis of sex. IBX's s policy allows coverage when a customer demonstrates a "[f]unctional impairment which results from a covered disease," and IBX does consider some treatments for gender dysphoria medically necessary. In theory, then, gender dysphoria can lift the limitation on coverage for "potentially cosmetic" treatments. Doe alleges, however, that in practice, IBX "requir[ed her] to state a physical deformity, disfigurement, abnormality, or impairment," instead of a "social [or] occupational" one like she did, to demonstrate a recognized "functional impairment."[5] *Cf. Doe*, 2023 WL 8050471, at *6.

---

[4] *Polonczyk v. Anthem BlueCross and BlueShield*, which held that an exclusion that "considered cosmetic" certain surgeries "when used to improve the gender specific appearance of an individual who has undergone or is planning to undergo sex reassignment surgery" did not violate Title IX, and on which IBX relies in its Motion, thus is contrary to the weight of the persuasive authority in this field. 586 F. Supp.3d 648, 651, 656 (E.D. Ky. 2022).

[5] As discussed *supra*, the policy documents that IBX attached to its Motion can be considered without converting it into a motion for summary judgment because they are relied upon in Doe's Second Amended Complaint. *In re Burlington Coat Factory*, 114 F.3d at 1426. But to the extent that "the truth of facts in an "integral" document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022). Thus, at this early stage in the litigation, Doe's understanding of the "functional impairment" exception laid out in her Second Amended Complaint governs the Court's interpretation of that policy.

Taking that allegation as true, as the Court must at this stage, that means that individuals like Doe who have been diagnosed with gender dysphoria—as defined in IBX's Policy Bulletin, "the distress that may accompany the incongruence between one's experienced/expressed gender and one's assigned gender (gender at birth or natal gender)"—cannot access the "potentially cosmetic" treatments IBX has identified as treatment for their gender dysphoria. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 596 (4th Cir. 2020) (noting that WPATH's standard of care for people with gender dysphoria "may involve living part time or full time in another gender role, consistent with one's gender identity," *i.e.*, altering the social presentation of one's gender identity); *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 492 (6th Cir. 2023) (White, J., dissenting) ("The goal of treatment for gender dysphoria is to reduce distress and improve functioning by enabling an affected person to live in conformity with the person's gender identity . . . ."). "By," in practice, "drawing a line between gender-affirming surgery and other operations," the way in which Doe alleges that the functional impairment policy is applied prevented her from doing so and thus "intentionally carve[d] out an exclusion based on one's transgender status." *Lange*, 101 F.4th at 799; *cf. Bostock*, 590 U.S. at 662.  It therefore discriminated against her, as a transgender person, on the basis of sex.  *See Lange*, 101 F.4th at 799 ("[One's] sex is inextricably tied to the denial of coverage for gender-affirming surgery."). It did so intentionally, as any adverse action based on one's transgender status "necessarily and intentionally discriminates against that individual in part because of sex." *Bostock*, 560 U.S. at 665.  Doe has stated a claim for sex discrimination under Title IX, and thus under the ACA, and IBX's Motion to Dismiss will be denied with respect to this count of the Second Amended Complaint.

### ii. Disability Discrimination Under the Rehabilitation Act

Section 504 of the Rehabilitation Act provides that no qualified individual with a

disability in the United States "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.  To state a claim under Section 504, Doe must plausibly allege that she "is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of [her] disability."  *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288-89 (3d Cir. 2019).  Whether gender dysphoria is a disability under federal disability statutes has divided courts,[6] but IBX proceeds assuming *arguendo* that Doe is a qualified individual with a disability, so the only question here is whether the Second Amended Complaint plausibly alleges that her diagnosis was "the sole cause" of IBX's denial of coverage.  *Id.* at 291 n.25 (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013)).  IBX's argument in favor of dismissing Doe's disability-based discrimination claim is similar to its argument on her sex-discrimination claim: because IBX "covers many procedures for the treatment of [gender dysphoria] and excludes coverage for cosmetic procedures for all members . . . absent certain functional impairments," it does not discriminate in the provision of healthcare coverage.

      That argument fails here as well.  As alleged in the Second Amended Complaint, IBX applied its "functional impairment" exception to its exclusion for cosmetic procedures in a way that discriminates against diagnoses of gender dysphoria.  Doe thus plausibly has alleged that she was discriminated against solely because of that diagnosis.  IBX's Motion to Dismiss will be denied with respect to this count of her Second Amended Complaint.

---

[6] *Compare, e.g.*, *Williams v. Kincaid*, 45 F.4th 759, 766-69 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023), *and Blatt v. Cabela's Retail, Inc.*, 2017 WL 2178123, at *2-4 (E.D. Pa. May 18, 2017), *with, e.g.*, *Williams*, 143 S. Ct. at 2416-19 (Alito, J., dissenting from the denial of certiorari), *and Lange*, 608 F. Supp.3d at 1360-63.

## IV. CONCLUSION

For the foregoing reasons, IBX's Motion to Dismiss will be granted in part and denied in part.

An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.

_____

**WENDY BEETLESTONE, J.**
